UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2003 DEC -2  P 4: 24

NEIL PACE

v.  : CIVIL ACTION NO.
  : 3:01cv1707(JCH)

NATIONAL RAILROAD PASSENGER  : December 1, 2003
CORPORATION

**RULING ON DEFENDANT'S MOTION FOR A NEW TRIAL [DKT NO. 107]**

In this action, the jury returned a verdict in favor of the plaintiff, Neil Pace. Defendant, National Railroad Passenger Corporation ("Amtrak"), moves for a new trial. For the following reasons, Amtrak's motion is denied.

**I.   BACKGROUND**

Pace, a former Amtrak conductor, asserted claims against Amtrak under the Federal Employers' Liability Act, 45 U.S.C. § 51 ("FELA"), which provides a remedy to railroad employees and their families for injuries and death resulting from accidents on interstate railroads. Pace alleged that he tripped on improperly maintained buffer plates while walking between railroad cars, and was damaged. He sued for damages for personal injuries, specifically, two herniated lumbar discs that he alleged, and the jury agreed, were caused in whole or in part by Amtrak's negligence.

The trial featured live or deposition testimony from a number of witnesses, including: the plaintiff; Amtrak Human Resources Manager Suzanne Allan; Amtrak General Foreman Paul Carver; plaintiff's treating surgeon Dr. William Druckemiller;

1

Amtrak engineer Dominic Esposito; Amtrak conductor Natalie King; Amtrak Mechanical Supervisor, New Haven Station, Stephen Pulio; Amtrak Mechanical Department worker Charles Smith; Amtrak's Manager of Terminal Services, Ronald Truitt; Amtrak Police Officer Clifford Tucker; and Amtrak Senior Claims representative Timothy L. Tychi. On its second day of deliberation, the jury returned a verdict for the plaintiff for past lost wages of $268,433; future lost wages of $1,130,725; past pain, suffering, mental anguish, and loss of enjoyment of life's activities of $75,000; future pain, suffering, mental anguish, and loss of enjoyment of life's activities of $1,200,000, for a total of $2,674,158.00. The jury also found that the plaintiff was 75% contributorily negligent.

## II.  DISCUSSION

Amtrak moves for a new trial on several grounds. First, it argues that the court erred in charging the jury concerning the defendant's alleged spoliation of evidence, and allowing the jury to draw an adverse inference. Second, it argues that the court further erred in allowing introduction of evidence concerning Amtrak's pre-litigation advances to the plaintiff. Third, Amtrak contests the court's decision to allow into evidence a medical report by defendant's IME expert, Dr. Kramer. Finally, Amtrak also argues that the jury's verdict is excessive and unsubstantiated by the evidence.

### A.  Standard

A district court may grant a new trial under Rule 59 if it "conclude[s] that the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice."

2

Manley v. Ambase Corp., 337 F.3d 237, 245 (2d Cir. 2003) (internal citations omitted). In other words, the district court may grant a new trial if the verdict is "against the weight of the evidence." Id.

As for evidentiary rulings, a trial court has considerable discretion in determining whether to admit or exclude evidence. Barrett v. Orange County Human Rights Comm'n, 194 F.3d 341, 346 (2d Cir. 1999). Evidentiary rulings are reviewed for an abuse of discretion. Manley, 337 F.3d at 247 (2d Cir. 2003). A motion for new trial on the basis of improper evidentiary rulings will be granted only where the improper ruling affects a substantial right of the moving party. Malek v. Fed. Ins. Co., 994 F.2d 49, 55 (2d Cir. 1993). Moreover, absent plain error, the Court will not review issues set forth as bases for a new trial pursuant to Rule 59 for which no timely objection was raised at trial. See, e.g., Fed. R. Evid. 103; Schaafsma v. Morin Vermont Corp., 802 F.2d 629, 636 (2d Cir. 1986) ("Unless this was plain error, plaintiffs' failure to object to the [issues now raised] on this ground precludes our review. . . . [T]he purpose of the contemporaneous objection rule . . . is to alert the trial judge to his error so that he can correct it . . . .").

B. Amtrak's Claims

1. Spoliation

The spoliation instruction given by the court involved defendant's non-production of several maintenance and inspection reports, which the plaintiff argued would have provided significant information about the state of the buffer plates on which Pace tripped, injuring

3

his back. Amtrak claimed that these records were destroyed pursuant to the defendant's normal file destruction calendar of two years. Defense counsel's discussion at the pretrial conference indicated that the records would have been destroyed sometime in July 2001, if destruction was made in accordance with the railroad's ordinary record destruction policy. The plaintiff argued that, by the time of the record destruction, Amtrak was well aware that litigation about Pace's injuries was imminent; indeed, among other things, it had already commissioned an IME expert to examine him in May 2001, and was conducting video surveillance to clandestinely evaluate the extent of his injuries as early as February 2000. The plaintiff thus requested that the court instruct the jury that it could infer that the contents of the missing maintenance and inspection records would be harmful to the railroad's position in this case. Amtrak claimed that it did not anticipate litigation until the plaintiff's suit was instituted in September 2001.

After requesting that both parties brief the issue, the court gave the following instruction:

> The plaintiff claims that the railroad failed to maintain inspection and maintenance records from the train cars involved in the accident. If you find that: (1) the records at issue would be relevant to the claims made by the plaintiff; (2) that the records were destroyed; and (3) by the time the records were destroyed, the railroad knew or reasonably should have known they would be relevant in litigation that was reasonably foreseeable, then you may infer that the contents of these destroyed records would be harmful to the railroad's position in this case. You need not draw this inference; I merely instruct you that you may.

In explaining its decision to give the instruction, the court noted, "sometime between when

the railroad first learned of the injury of this plaintiff [in July 1999] and late August of 2001, and in advance of the two year period from July 27 of 1999, it was reasonably foreseeable that there would be litigation in this case." [Tr. 7/28/03, in Gianetta Aff., Dkt. No. 113, Ex. D at 26]. The court pointed to several factors: first, that the plaintiff's injury was significant, requiring surgery in May 2000, and that, in December 2000, the plaintiff's surgeon had determined that the plaintiff had reached his maximum possible recovery; second, that Amtrak retained Dr. Kramer in May 2001 to provide a report to confirm the extent of the plaintiff's injury; third, that there was a claims person working on the case; and fourth, that Amtrak began conducting video surveillance of Pace in February 2000, which continued in March, July, and August 2000. The court found that this was "evidence of a state of mind that people were preparing for that litigation which leads to the conclusion or supports my conclusion that it was reasonably foreseeable, certainly by the middle to late 2000 . . . [and] no later than when the IME was ordered in May and given in May of 2001."

Amtrak argues that the court erred in this ruling and in giving the charge. Jury instructions are erroneous if they "mislead the jury or do not adequately inform the jury of the law." Caruolo v. Crane, Inc., 226 F.3d 46, 56 (2d Cir. 2000). Instructions are reviewed de novo, and to merit a new trial, must have been prejudicial in light of the charge as a whole. Id.

A party seeking an adverse inference instruction for spoliation or non-production of

evidence must show that (1) the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed "with a culpable state of mind," and (3) that the destroyed evidence was "relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 108 ((2d Cir. 2002)(quoting Byrnie v. Town of Cromwell, 243 F.3d 93, 107-12 (2d Cir. 2001). A party is under an obligation to preserve the evidence when the party "has notice that the evidence is relevant to litigation" or when it "should have known that the evidence may be relevant to future litigation." Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 436 (2d Cir. 2001). See also Byrnie, 243 F.3d at 107 (quoting Kronish v. United States, 150 F.3d 112, 126 (2d Cir. 2001)). "Relevant" evidence for spoliation purposes means that "the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that "the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction." Residential Funding, 306 F.3d at 109 (quoting Kronish, 150 F.3d at 127).

The "culpable state of mind" prong forms the basis of the controversy in this case. In Residential Funding, the Second Circuit found that the culpable state of mind element is satisfied if the evidence was destroyed "knowingly, even if without intent to [breach a duty to preserve it], or negligently." Id. at 108 (quoting Byrnie, 243 F.3d at 109) (holding that district court was in error if it only considered gross negligence and bad faith as basis for

6

giving adverse inference instruction). The court quoted approvingly the standard announced in Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 75 (S.D.N.Y. 1991), which explained that the sanction of adverse inference instruction should be available even for the "negligent destruction of documents, if necessary to further the remedial purpose of the inference," because "it makes little difference to the party victimized by the destruction of evidence whether that act was done willfully or negligently." Residential Funding, 306 F.3d at 108 (quoting Turner, 142 F.R.D. at 75).[1]

Amtrak argues that this court erred in allowing the state of mind requirement to be satisfied by a showing of negligence. It maintains that the standard enunciated by Residential Funding is inapplicable because that case involved post-litigation discovery abuses. In Residential Funding, however, the Second Circuit discussed destruction of evidence generally, finding that "the culpable state of mind factor is satisfied by a showing that the evidence was destroyed knowingly, even if without an intent [to breach a duty to preserve it] or *negligently*." Id. at 108 (internal quotations omitted; brackets and emphasis in original). It further explained that "[t]he sanction of an adverse inference may be appropriate in some cases involving the negligent destruction of evidence because each party

---

[1] Previous Second Circuit cases offered different and shifting standards. Compare Altschuler v. Univ. of Pennsylvania. Sch. of Law, 201 F.3d 430, 1999 WL 1314734 (2d Cir., Dec. 26, 1999)(requiring showing of bad faith in order to give adverse inference on spoliated evidence) and Fujitsu, 247 F.3d at 436 (requiring intentional destruction) with Reilly v. Natwest Markets Group, Inc., 181 F.3d 253, 267 (2d Cir. 1999)(bad faith is not a "per se" rule, and gross negligence may suffice).

should bear the risk of its own negligence." Id. at 108. The panel gave no indication that it intended for its ruling to be confined to post-litigation destruction.

To the extent that this court's determination relied on the negligence standard enunciated in Residential Funding,[2] the court finds no support for Amtrak's argument that the case only applies to post-litigation disputes. Indeed, the opinion makes clear that its standards apply to document destruction generally. See id. at 108.

As the Second Circuit explained, the inference "is adverse to the destroyer not because of any finding of moral culpability, but because the risk that the evidence would have been detrimental rather than favorable should fall on the party responsible for its loss." Residential Funding, 306 F.3d at 108. That rationale certainly applies here, where the plaintiff's claim turned on whether the railroad had improperly maintained its cars and specifically the buffer plates, and the various unavailable records related to their inspection and maintenance.

Further, contrary to the defendant's suggestion, the litigation was reasonably foreseeable at the time that the defendant estimates that the document destruction took place. Based on the defendant's document destruction policy, the documents would have been destroyed sometime around July of 2001. The railroad was conducting clandestine video surveillance to evaluate the scope of Pace's injuries as early as February 2000, and it

---

[2]The court actually found that Amtrak's actions amounted to "something more than negligence."

continued to monitor him intermittently throughout 2000. Amtrak then had Dr. Kramer issue his own evaluation of Pace's condition in May 2001.

The instruction given by this court, which merely allowed the jury to draw an adverse inference, was given after extensive consideration and was appropriately modeled, within the court's discretion, to: deter future spoliation of evidence; protect the plaintiff's interests; and remedy the prejudice plaintiff suffered as a result of the defendant's actions. West, 167 F.3d at 780. For the reasons discussed above and those given from the bench to support the court's initial ruling, the court finds that the spoliation charge was proper.

### 2.     Pre-Litigation Advances

Amtrak also argues that the court erred in allowing testimony about its prelitigation advances to the plaintiff. There are several problems with Amtrak's claim.

The issue of the prelitigation advances first arose at the pretrial conference. Though both defendant and plaintiff originally sought to introduce the advances as evidence, defense counsel withdrew the submission at the conference and objected to their introduction into evidence by the plaintiff. The plaintiff argued that the advances were relevant to the amount of Mr. Pace's losses, to establishing foreseeability of litigation for the purpose of establishing the railroad's obligation to preserve documents that were destroyed, and to refuting the defense's claim that Mr. Pace had failed to mitigate his damages. The parties agreed to stipulate as to his economic losses and to have the advances deducted from any verdict, post-verdict, by the court. Defense counsel further offered to withdraw the mitigation

9

claim for the period when the advances were being made. As a result, the court made a preliminary ruling excluding the advances:

> I think, at this point, I'm going to sustain her objection to it and there shouldn't be any reference to these payments. I will revisit the issue if you ask me to, depending upon how the evidence comes out but the way I see it coming out now, there's no need to put it before the jury, everybody's in agreement that I'll deduct it off the verdict before judgment enters . . . there really isn't any need to introduce it, as of what I understand the evidence will be today.
>
> Depending on cross-examination of the plaintiff or anything else, if the door gets opened, then you can discretely suggest to me you wish to offer Exhibit 10 without telling the jury anything about it and I will just decide on whether the door's open or not. . . .

[Tr. 7/8/03, Gianetta Aff., Dkt. No. 113, Ex. H at 34.]

At trial, plaintiff's counsel called Amtrak Claim Representative Tim Tychi as a witness. On direct examination, Tychi testified:

> Q   You indicated that you first went to see Neil Pace on August 30, 1999, --
> A   It was July 30th.
> Q   July 30th, you discussed with him how he would be paid by the company when he was out injured?
> A   Correct
> Q   What did you mean by that?
> A   The corporation has an advance policy for injured employees.
> Q   Okay. What is the purpose of that policy?
> A   To assist the employees with monies coming in while they're out injured.
> Q   And you anticipate that they're going to return to work for Amtrak, isn't that true?
> A   Initially.
> Q   And are they referred to as advancements?
> A   Yes, they are.
> Q   And you continued giving Mr. Pace advancements up until August of 2001, isn't that true?
> A   Thereabouts. I don't know the exact date.
> Q   All right. Isn't it true that – what was the total amount of advancements that

10

>       you gave to Mr. Pace?
> A     I believe around $127,000.
> Q     All right. And that was paid to him on a weekly basis?
> A     Weekly. Correct.
> . . . .
> Q     So you paid Neil $127,000. You had surveillance on him during that period of time with Countermeasures. You monitored all his medical treatment. Isn't it true that you anticipated that there might be litigation in this case?
> A     No.

[Tr. 7/24/03, Gianetta Aff., Dkt. No. 113, Ex. E at 36]. At no time during this long colloquy did the defense object.[3]

Plaintiff's counsel then asked the witness to identify Exhibit 10. At this point, defense counsel asked: "I'm sorry, what are you showing the witness?" Plaintiff's counsel clarified, "Exhibit 10." Again, defense counsel did not object. Questioning resumed:

> A     It [Exhibit 10] is an advance form for 8/21/01 to Mr. Pace.
> Q     Did you provide that form to Mr. Pace?
> A     My secretary did.

[Id. at 37]. Plaintiff's counsel then offered Exhibit 10 into evidence as a full exhibit. Defense counsel told the court, "At this point, I have no objection." The court thus admitted Exhibit 10 as a full exhibit.

On cross-examination, defense counsel elicited testimony that the advance payments stopped "within a week to ten days" after Amtrak learned that the plaintiff had obtained

---

[3]At one point during the direct examination of the plaintiff, plaintiff's counsel asked, "Mr. Pace, were you receiving advancements from Amtrak through 2001?" The plaintiff answered, "Yes." Plaintiff's counsel then shifted the examination to an unrelated subject. There was no objection from defense counsel. [Tr. 7/24/03, Gianetta Aff., Dkt. No. 113, Ex. F at 88].

11

counsel. Defense counsel also elicited testimony about the payments as an attempt to "settle" the case, and began to directly inquire, "did you believe you were attempting to reach a settlement?" Plaintiff's counsel objected to the leading nature of the question, and the witness never answered. Later on cross-examination, defense counsel clarified:

> Q  By paying advancements, is the railroad admitting liability?
> A  No, they are not.

[Id. at 40].

Defense counsel's failure to object to the testimony or the admission of Exhibit 10 into evidence precludes review unless the defendant can demonstrate "plain error." Schaafsma, 802 F.2d at 636; F.R.E. 103(d). The court finds that admission of the evidence was not erroneous, and in any case, not "plain error."

Defense counsel opened the door to the advancement evidence during her preceding cross-examination of the plaintiff on the issue of mitigation. After asking the plaintiff a series of questions regarding job openings at Amtrak and his attempts to find work, defense counsel commented, "you would have preferred to remain out of work and wait for a block operator's job being handled by the Boston office for the Connecticut area rather than taking a job that you were qualified for and that you wanted and that was available immediately in New York?" [Tr. 7/24/03, Gianetta Aff., Dkt. No. 113, Ex. F at 131]. Counsel's series of questions created the distinct impression that Mr. Pace had been less than diligent in his attempt to find work. Her questioning did not distinguish the post-payment period from the time during which Mr. Pace was indeed receiving advancements.

12

At the pretrial conference, the court acknowledged that the advancements might be relevant to Amtrak's affirmative defense that the plaintiff failed to mitigate his damages by obtaining alternative employment. As a result, allowing evidence of the advances was necessary to Pace's defense against that claim.

Finally, it was defense counsel, not plaintiff's counsel, who first elicited testimony, from defense representative Tychi, connecting the advances to settlement and liability. Mr. Tychi's testimony on direct examination had concerned merely the company's policy of giving salary advances to injured employees. It was only on cross-examination that defense counsel characterized the payments as an attempt to settle the claims, creating the inference between payment and settlement and liability. Defense counsel cannot make a strategic decision to present testimony on an issue, then post-hoc seek a new trial based on its own strategy. Moreover, at no time did plaintiff's counsel argue that the advances were evidence of liability. Mr. Tychi also testified that the railroad was not admitting liability through the payments, but were part of "an advance policy for injured employees." The court further instructed the jury on the proper considerations for a negligence claim, emphasizing that the mere fact that the plaintiff was injured at work did not mean that the railroad was negligent. It was clear to the jury that Amtrak did not through the payments admit any liability for the accident. As a result, even if there was any error, it was harmless.

### 3.    Dr. Kramer's IME Report

Amtrak also argues that the court erred in admitting the IME report of defendant's

13

expert Dr. Kramer, who was listed as a trial witness but not called to testify. Amtrak argues that the report was not a business record or a statement of a party-opponent, and was thus inadmissible hearsay.

Medical reports can be admissible as business records. Federal Rule of Evidence 803(6) specifically includes opinions and diagnoses made by businesses or professions of "every kind," unless some method or circumstance indicates lack of trustworthiness. See 5 Jack B. Weinstein and Margaret A. Berger, Weinstein's Federal Evidence § 803.08[6][b] (Joseph M. McLaughlin, ed., 2d ed. 2003), John W. Strong, McCormick on Evidence § 288 (Pocket Part 2003). Records of a patient examined for diagnosis in connection with pending litigation present a question of trustworthiness, but are not necessarily inadmissible. Weinstein at § 803.08[6][d].

Before the adoption of Rule 803(6), the business records exception was contained in 28 U.S.C. § 1732. Today the two sections work in tandem, and the statute specifies that it should not be read to make inadmissible anything which would be otherwise admissible under the rules of evidence. In other words, the statute broadens the Rule. Courts in this circuit considering the issue have consistently held such records to be admissible as long as they are offered by the opposing party, not the party whose doctor made the report. Korte v. New York, N.H. & H.R. Co., 191 F.2d 86, 89-91 (1951); Yates v. Bair Transp. Inc., 249 F. Supp. 681, 690 (S.D.N.Y. 1965)(citing United States v. New York Foreign Trade Zone Operators, 304 F.2d 792, 798 (2d Cir. 1962)). See also, M. Graham, Federal Practice

14

and Procedure: Evidence § 7047 (Interim ed. 2000). Here, plaintiff offered the defendant's medical expert's report.

Amtrak further argues that the plaintiff failed to lay the required foundation for admission of Dr. Kramer's report as a business record, but this contention also fails. The report was initially listed as an exhibit by both parties in the Joint Trial Memorandum, and then defendant did not withdraw the exhibit and object to it until the pretrial conference. Furthermore, the court did not rule the report admissible until the end of the plaintiff's case, when Amtrak informed the court that, contrary to its previous plans, it no longer intended to call Dr. Kramer as a witness. This delay prejudiced the plaintiff because he relied on having Dr. Kramer's testimony and with the late withdrawal, left him unable to compel his appearance. A letter from Claim Agent Tychi to Dr. Kramer confirmed that Dr. Kramer writes IME reports as part of his overall medical practice. As a result, the report falls squarely within the business records exception and was properly admitted into evidence.[4]

---

[4]Even if it was not, the report would still fall squarely within the catchall hearsay exception of Fed. R. Evid. 807. Rule 807 provides that evidence not specifically included in other hearsay exceptions but having "equivalent circumstantial guarantees of trustworthiness" is not excluded if the court finds that the evidence is (A) offered as evidence of a material fact; (B) is more probative than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purpose of the rules and the interests of justice is served by the admission of the evidence. As evidence of Mr. Pace's medical condition after the accident, the IME report was evidence of a material fact in the case. Given the defendant's 11th hour decision not to call Dr. Kramer as a witness, the report was more probative than any other available evidence on the plaintiff's injuries condition, and its admittance into evidence served the interests of justice. Moreover, since the report came from the defendant's own expert and proposed witness, there was no undue prejudice or surprise to the defendant from its admittance. As offered by the plaintiff, the report had

4.  **Jury's Verdict**

Finally, Amtrak argues that the jury's verdict was excessive and unsubstantiated by the evidence. Specifically, it argues first that the award for future wages and benefits is only justified if the plaintiff is unable to work for Amtrak in the future, and second that the jury's award of $1,200,000 for future pain, suffering, mental anguish, and loss of enjoyment of life's activities is excessive.

The jury awarded plaintiff Pace $1,130,725 in future lost wages and benefits. Pace claimed that he would have worked until age 65 and that his net future wage loss over 26 years was $1,786,075 (($53,440 x 29) + ($8,141 per year in lost benefits x 29)). If the jury had assumed that the plaintiff would have retired earlier, at age 60, his future wage loss would have been $1,478,131. Under either measurement, the jury's verdict was well below the amount they could have reasonably found.

Defendant claimed as an affirmative defense that the plaintiff had failed to mitigate his damages, and presented evidence that comparable Amtrak jobs were available in other states. Pace testified that he did not accept the offers in New York or New Jersey because of the substantial unpaid commute from his Watertown, Connecticut home. Pace testified that he found the commute unacceptable because of the time it would require him to spend away from his children, and because of the uncompensated commute time. He also testified about his unsuccessful efforts to obtain an Amtrak job in Connecticut, as well as his efforts

---

circumstantial guarantees of trustworthiness.

16

to obtain other jobs and his work as a school bus driver and as a Macy's security guard. As a result, it was reasonable for the jury to decline to further reduce his future wage award for failure to mitigate. See Schneider v. Nat'l R.R. Passenger Corp., 987 F.2d 132, 136 (2d Cir. 1993).

Amtrak also argues that the jury's award for future pain, suffering, mental anguish, and enjoyment of life's activities is excessive. It compares the jury's award of $75,000 for past pain, suffering, mental anguish, and enjoyment of life's activities, with its $1,200,000 award for future pain, suffering, mental anguish, and loss of enjoyment of life's activities.

The court is "not . . . justified in substituting its judgment for that of the combined experience of twelve jurors, unless it conscientiously believe[s] that the jury has exceed the bounds of propriety." Earl v. Bouchard Transp. Co., 917 F.2d 1320, 1329 (2d Cir. 1990). A jury verdict is excessive if it is "so high as to 'shock judicial conscience.'" Schneider, 987 F.2d at 137-38.

The defendant cites a number of cases, including Nairn v. Nat'l R.R. Passenger Corp., 837 F.2d 565, 568 (2d Cir. 1988). In Nairn, the court found that a jury's verdict of $765,000 for past and future pain and suffering was excessive. Nairn, however, is distinguishable. Nairn had suffered a lumbosacral strain which produced a certain degree of disc degeneration, and as the court emphasized, "[o]ther than his initial visit to the emergency room, he had never been hospitalized or required surgery." Id. at 567. Significantly, his "capacity for working had increased significantly over the past year" and

17

his doctor "testified that he would expect to see Nairn several times a year during the next five to ten years and then gradually, [and] the disc will provide very little difficulty unless there was further trauma to it." Id. (internal quotation marks omitted).

In contrast, there was ample evidence from which the jury could have concluded that Pace's pain would continue and probably even worsen as he ages. He testified that "there's always pain in my back and parts of my legs, [and] my butt." He also testified that his back flares up on occasion, and that one February 2003 incident sent him to the emergency room. This testimony was further substantiated by that of his surgeon, Dr. Druckemiller, and by the IME report of defendant's own doctor, Dr. Kramer, who concluded that Pace had "chronic residual lower back pain and sciatica." Nor was it unreasonable for the jury to think that his pain might get worse, not better, as he ages. Unlike Nairn, Pace has also undergone surgery, and there was no testimony that he has experienced a significant improvement in his working capacity. See Schneider, 987 F.2d at 137-38 (verdict must be examined in light of plaintiff's "particular injuries").

Moreover, the jury's award in this case not only included pain and suffering, but also included damages for mental anguish and loss of enjoyment of life's activities. The plaintiff credibly testified to the pain he suffers constantly and the particular incidents when it is excruciating, including sometimes requiring hospitalization. He also testified about his enjoyment of his Amtrak job, and his loss at being unable to continue in his former occupation. Finally, he also testified as to how the injury has limited his personal life,

including his involvement with and relationship with his children, because of the restriction on the amount of physical activity of which he is capable.

Considering the record as a whole, and accepting the plaintiff's very credible testimony on matters affecting this aspect of his loss, the court cannot conclude that the verdict "shocks the judicial conscience." Schneider, 987 F.2d at 137-38. Therefore, the court denies the motion for a new trial on this ground, as well as on the other three ground raised by the defendant.

## III.  CONCLUSION

For all the foregoing reasons, the defendants motion is DENIED.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 1st day of December, 2003.

                    Janet C. Hall
                      United States District Judge